UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 19 C 06716 |
| v. | ) ) | Judge Edmond E. Chang |
| DWORKIN, INC., *et al.*, | ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

The Central States Pension Fund alleges that a group of related companies owes withdrawal liability to the Fund under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq*.[1] The lead defendant is Dworkin, Inc., which apparently was a trucking company. Dworkin was the primary owner of Triumph Trucking of Cleveland, Inc. (call it Cleveland for convenience's sake), which in turn was the sole owner of Triumph Trucking of Newburgh, Ltd. (referred to as Newburgh in this Opinion). The Defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(3), arguing that this Court is the improper venue for their dispute because the parties are already in the midst of mandatory arbitration over the amount and payment timeline of the withdrawal liability. R. 16, Defs.' Mot. Dismiss

---

[1]The Court has federal-question subject matter jurisdiction over this action under 29 U.S.C. § 1451(c) and 28 U.S.C. § 1331.

1

at 1.² In light of the nature of the dispute—enforcement of the "pay now, dispute later" provision of ERISA, the Court also instructed the parties to brief whether denial of the dismissal motion necessarily meant that the Pension Fund is entitled to judgment. R. 23. For the reasons discussed below, the motion to dismiss or to stay is denied, and instead judgment is entered in favor of the Pension Fund.

## I. Background

For purposes of a motion to dismiss on improper-venue grounds, the Court accepts as true the allegations in the complaint unless the defense offers evidence to the contrary. *Faulkenberg v. CB Tax Franchise Systems, LP*, 637 F.3d 801, 806 (7th Cir. 2011). Dworkin and Newburgh were trucking companies that participated in the multi-employer Pension Fund, obligating them to contribute to the Fund pursuant collective bargaining agreements with certain local unions. Compl. ¶¶ 4, 16. Dworkin owned at least 80% of the total voting shares of Triumph of Cleveland. *Id*. ¶ 12. In turn, Cleveland collectively owned at least 80% of the membership interest of Newburgh. *Id*. ¶ 13. Dworkin, Cleveland, and Newburgh thus qualified as a group of businesses under common control, which the parties refer to as the "Dworkin Controlled Group." *Id*. ¶ 14.³

---

²Citations to the docket are indicated by "R." followed by the docket number and, where necessary, a page or paragraph citation.

³The membership of the "Dworkin Controlled Group"—which is relevant to the question of whether the withdrawal liability may appropriately be accelerated—is one of the topics of the ongoing arbitration. R. 16-2, Defs.' Mot. Dismiss, Exh. 2, Req. for Arb. at 5. But in an October 12, 2017 letter to the Pension Fund, Dworkin and Newburgh affirmed that "the Dworkin/Triumph controlled group also includes Cleveland as well as Dworkin and Triumph." Mot. Dismiss, Exh. 2 (Oct. Letter) at 1 n.1. In the briefing in this case, the defense did not rebut this characterization. Given the parties' apparent agreement, the Court will

In late February 2017, both Dworkin and Newburgh "permanently ceased to have an obligation to contribute to the Pension Fund and/or permanently ceased all covered operations, thereby effecting a 'complete withdrawal' from the Pension Fund." *Id.* ¶ 17. As a result of the withdrawal, the Pension Fund sent a letter to Dworkin and Newburgh in June 2017, notifying the companies that it believed that they had withdrawn from the Fund and requesting completion of a "Statement of Business Affairs." R. 28-1, Defs.' Reply, Ex. 1, June 2017 Letter. In July 2017, the Pension Fund demanded that the Defendants pay withdrawal liability of $6,525,802.79, due in full on August 1, 2017. Compl. ¶ 19. The Pension Fund invoked an ERISA provision, 29 U.S.C. § 1399(c)(5)(B), to demand immediate payment when it is substantially likely that an employer will be unable to pay its withdrawal liability in installments. *Id.*

In October 2017, the Defendants responded and asked for a review of the withdrawal liability, invoking an ERSIA liability-review provision, 29 U.S.C. § 1399(b)(2)(A). *Id.* ¶ 21. The next month, the Pension Fund rejected the request for review and repeated its demand for full payment of the liability—by then revised upward to $7,722,361.20—pursuant to the immediate-payment provision. *Id.* ¶¶ 20, 22. In January 2018, Dworkin and Newburgh initiated arbitration under ERISA, 29 U.S.C. § 1401(a), to determine (1) which entities would be deemed part of the controlled group (and therefore could be responsible for withdrawal liability); and (2)

---

treat as established the fact that Dworkin, Triumph, and Cleveland together constitute the "Dworkin Controlled Group."

3

whether the 20-year payment schedule permitted under 29 U.S.C. § 1399(c)(1)(B) should apply to the controlled group. *Id.* at ¶ 23; Req. for Arb. at 5.

In the meantime, the Defendants have made no withdrawal liability payments, so the Pension Fund brought this lawsuit seeking to collect. Compl. at ¶¶ 1, 25. The Defendants now move to dismiss, arguing that this Court is the improper venue for resolving the collection dispute because it is already pending before the American Arbitration Association. Defs.' Mot. Dismiss at 3.[4] In the alternative, the Defendants seek to stay this litigation pending resolution of the arbitration. *Id.*

## II. Standard of Review

A motion to dismiss for improper venue under Rule 12(b)(3) is the appropriate procedural vehicle to invoke when a litigant seeks to dismiss a lawsuit based on an arbitration clause. *Faulkenberg v. CB Tax Franchise Systems, LP*, 637 F.3d 801, 808 (7th Cir. 2011). "Although the Federal Arbitration Act favors resolution of disputes through arbitration, its provisions are not to be construed so broadly as to include claims that were never intended for arbitration." *American United Logistics, Inc. v. Catellus Dev. Corp.*, 319 F.3d 921, 929 (7th Cir. 2003). Whether the parties have agreed to arbitrate "is a question normally answered by the court rather than by the arbitrator." *Continental Cas. Co. v. American Nat. Ins. Co.*, 417 F.3d 727, 730 (7th Cir. 2005). But mindful of the "liberal federal policy" favoring arbitration, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration …." *Id.* at 730-31.

---

[4]The parties' ongoing arbitration is captioned *Dworkin, Inc., et al. v. Central States, Southeast and Southwest Areas Pension Fund*, AAA Case No. 01-18-0000-2189.

4

Under Rule 12(b)(3), the Court must assume the truth of the plaintiff's factual allegations (unless the defense offers evidence to the contrary) and draw reasonable inferences in the plaintiff's favor. *Faulkenberg*, 637 F.3d. at 806. The Court is not limited to consideration of the pleadings when ruling on a motion to dismiss for improper venue, though, and if there is a dispute over the factual allegations, then the Court may consider evidence submitted with the motion without converting it to a summary judgment motion. *Id.* at 809-10.

### III. Analysis

This dispute over withdrawal liability arises under ERISA, 29 U.S.C. §§ 1001, *et seq.*, and specifically as amended by the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), 29 U.S.C. § 1301-1461. Under ERISA, a multi-employer pension plan "is created when various employers agree to make contributions to a common pension fund on behalf of their respective employees." *Cent. States Se. & Sw. Areas Pension Fund v. O'Neill Bros. Transfer & Storage Co.*, 620 F.3d 766, 767 (7th Cir. 2010). Congress later enacted the MPPAA "to address the risk of insolvency that arises when an employer withdraws from a [multi-employer] pension plan." *Nat'l Shopmen Pension Fund v. DISA Indus., Inc.*, 653 F.3d 573, 757 (7th Cir. 2011). The MPPAA "discourages withdrawal and protects the solvency of multiemployer pension plans by making an employer that withdraws from the plan liable for an amount of money designed to cover the employees' share of the vested, but not unfunded,

5

benefits," *id*. (cleaned up);[5] in other words, it creates "a substitute for the annual payments that an employer would have made had [it] not withdrawn," *Cent. States, Se. & Sw. Areas Pension Fund v. Basic Am. Indus.*, 252 F.3d 911, 918 (7th Cir. 2001). The statute provides formulas for calculating the amount and the installment-payment schedule of withdrawal payments, 29 U.S.C. §§ 1391, 1399(c), and the plan sponsor must notify an employer as soon as practicable of the amount of the liability and the payment schedule that the plan has set. 29 U.S.C. § 1399(b). An employer "may seek review of [the plan sponsor's] calculations and then challenge the plan's determination in arbitration." *O'Neill*, 620 F.3d at 768 (citing 29 U.S.C. §§ 1399(c), 1401(d)). If the employer is found to have overpaid, then its overpayments are returned. 29 U.S.C. § 1401(d).

Here, the Defendants argue that the Pension Fund's effort to collect withdrawal liability is "premature and improper" because the parties are currently engaged, pursuant to 29 U.S.C. § 1401, in mandatory arbitration over the amount and the installment schedule. Defs.' Mot. Dismiss at 1. Under the statute, it argues, "any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title *shall* be resolved through arbitration." 29 U.S.C.A. § 1401 (emphasis added); *see also Robbins v. Chipman Trucking, Inc.*, 866 F.2d 899, 902 (7th Cir. 1988) ("*Any* dispute over withdrawal liability ... *shall* be arbitrated." (emphases in original)). So disputes

---

[5]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

over the amount and the installment schedule of liability payments—which fall within ERISA Section 4219—must be arbitrated. Moreover the Pension Fund's own plan rules provide that "[a]ny dispute concerning … the amount and/or payment of any withdrawal liability" shall be resolved first through a review by the Fund and, thereafter, by arbitration. Defs.' Mot. Dismiss, Exh. 1, Pension Plan App'x E at 126-27.

That is all true—as far as it goes. Yes, the amount of withdrawal liability and the payment schedule ultimately will be determined via arbitration. But that does not impact the Pension Fund's ability to *collect* withdrawal liability in the meantime. To keep pension funds solvent, ERISA establishes a "pay now, dispute later" collection framework under which "withdrawal liability is ordinarily payable *during* the pendency of arbitration." *O'Neill*, 620 F.3d at 772 (emphasis added). To effectuate that collection framework, ERISA instructs: "Withdrawal liability shall be payable in accordance with the schedule set forth [by the plan sponsors] … *notwithstanding* any request for review or appeal of determinations of the amount of such liability or of the schedule." 29 U.S.C. § 1399(c)(2) (emphasis added). Similarly, in the ERISA provision that creates the arbitration scheme, again pay-now, dispute-later is established: "Payments *shall* be made by an employer in accordance with the determinations made under this part *until* the arbitrator issues a final decision …." 29 U.S.C. § 1401(d) (emphasis added).

This "pay now, dispute later" system is especially relevant where, as here, a plan sponsor finds that an employer is in "default" as defined by ERISA. If there is a

7

default for ERISA purposes, then pension plans may demand *immediate* payment of the outstanding amount of the withdrawal liability. *O'Neill*, 620 F.3d at 768. ERISA deems an employer in "default" in two ways: (1) if an employer fails "to make, when due, any payment under [29 U.S.C. § 1399], [and] if the failure is not cured within 60 days after the employer receives written notification from the plan sponsor of such failure," and (2) if there occurs "any other event defined in the rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability." 29 U.S.C. § 1399(c)(5). The first type of default is a "missed payment default"; the second is an "insecurity default." *O'Neill*, 620 F.3d at 774 n.8. An "insecurity default" calls into question an employer's ability to make future payments, so when a plan sponsor determines that an employer has incurred an insecurity default, then "the entire amount of the withdrawal payment is immediately payable upon default and that obligation is not deferred because of the pendency of arbitration." *O'Neill*, 620 F.3d at 775.

Here, the Pension Fund accelerated the withdrawal liability payment schedule because it determined that Dworkin's and Newburgh's cessation of operations constituted an insecurity default. Under 29 U.S.C. § 1399(c)(5), pension plans may define what type of "event" qualifies as an insecurity default so long as the event "indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability." § 1399(c)(5). Here, the Pension Fund's rules define a default to include, among other things: "(A) the Employer's insolvency ... (E) the cessation of all or substantially all of an Employer's operations, or the liquidation of all or

8

substantially of an Employer's assets … or (G) any other event or circumstance which in the judgment of the Trustees materially impairs the Employer's credit worthiness or the Employer's ability to pay its withdrawal liability when due." Pension Plan App'x E, Sections 5(e)(2)(A), (E), and (G). In the July 2017 letter, the Pension Fund put Dworkin and Newburgh on notice that the companies' cessation of operations met the Section 5(e)(2)(E) criteria because "[i]n light of the shutdown of Dworkin, Inc. and Triumph Trucking of Newburgh, LTD, the Pension Plan believes that there is a substantial likelihood that the employer will be unable to pay its withdrawal liability." Defs.' Mot. Dismiss, Exh. 2 at 17 (July Letter). A few months later, in the November 2017 letter, the Pension Fund again cited the cessation of operations, and this time added the Defendants' insolvency: "[b]ased on the fact the Dworkin Controlled Group claims it is insolvent as well as the fact Dworkin and Triumph ceased operations, the Pension Fund acted in accordance with … Appendix E, Sections 5(e)(2)(E) and 5(e)(2)(A) by demanding immediate payment of the 2017 complete withdrawal liability assessment." *Id.* at 45 (Oct. Letter). Those circumstances—the cessation of operations and the Defendants' insolvency— qualified as insecurity defaults under 29 U.S.C. § 1399(c)(5), thus providing the Pension Fund with the legal authority to demand full and immediate payment of the withdrawal liability instead of having to resort to a 20-year installment schedule.

In response, Dworkin and Newburgh challenge the validity of the Pension Fund's insecurity-default determinations. Mot. Dismiss at 6; R. 28, Defs.' Reply at 2-6. According to the Defendants, the membership of the Dworkin Controlled Group—

the "employer" under ERISA that is responsible for paying the withdrawal liability to the Pension Fund[6]—is itself contested; therefore, without first confirming the membership of the controlled group, the Pension Fund could not possibly evaluate the group's solvency for purposes of establishing an insecurity default. Defs.' Reply at 2-6.

But the Defendants offer no valid reason to dispute that the membership of the Dworkin Controlled Group comprises Dworkin, Newburgh, and Cleveland. Indeed, in the October 12, 2017 letter written by the law firm that is still representing the Defendants (Hahn Loeser & Parks LLP), the Defendants outright conceded that "the Dworkin/Triumph controlled group also includes Cleveland as well as Dworkin and Triumph" and that it "does not include any of the Other Companies." Defs.' Mot. Dismiss, Exh. 2 at 1 n.1, 4. Nowhere in the briefing do the Defendants offer any reason to doubt that concession. *See* R. 16, 28. At least in this case, there simply is no open question on the membership of the controlled group that would undermine the Pension Fund's assessment of an insecurity default.

---

[6]Section 1381(a) of Title 29 provides that an "employer" that withdraws from a multi-employer pension plan either fully or partially is liable to the plan for withdrawal liability. If the withdrawing employer cannot pay the amount in full, then the plan may recover from "trades or businesses" under "common control" with the withdrawing employer. 29 U.S.C. § 1301(b)(1) ("For purposes of this subchapter … all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer.") Those other trades or businesses, in addition to the withdrawing employer, are deemed a "controlled group" under the MPPAA and thus are jointly and severally liable for the withdrawal liability incurred by any one group member. *Central States, Se. and Sw. Areas Pension Fund v. Koder*, 969 F.2d 451, 452 (7th Cir. 1992).

10

It is possible that Dworkin and Newburgh are relying on the fact that the Pension Fund's July and November letters referred to Dworkin and Newburgh—but not Cleveland—as part of the Dworkin Controlled Group. Defs.' Mot. Dismiss, Exh. 2 at 16 (July Letter), at 44 (Oct. Letter). But that too does not matter. The controlled-group provision of the MPPAA allows a pension plan "to deal exclusively with the defaulting employer[s] known to the fund, while at the same time assuring itself that legal withdrawal remedies can be maintained against all related entities in the control group." *Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. El Paso CGP Co.*, 525 F.3d 591, 595-6 (7th Cir. 2001). So the Pension Fund had no obligation to directly address Cleveland, which was not a direct party to the pension plan. All that the Pension Fund needed to do to declare an insecurity default was identify the circumstances creating a "substantial likelihood" that the Dworkin Controlled Group would be unable to pay the withdrawal liability. 29 U.S.C. § 1399(c)(5); App'x E, Section 5(e)(2). Even with Cleveland in the mix, Dworkin's and Newburgh's cessation of operations and insolvency would have been more than enough to trigger a "substantial likelihood" of non-payment for the group, especially where—by Dworkin's and Triumph's own representations—Cleveland's "sole asset" was a worthless "100% membership interest in Triumph of Newburgh," which itself was insolvent. Defs.' Mot. Dismiss, Exh. 2 (Oct. Letter) at 1 n.1. So with or without Cleveland, there were ample grounds for the Pension Fund's declaration of an insecurity default, and the withdrawal payment schedule thus was permissibly accelerated.

11

It is true that the "pay now, dispute later" mechanism under the MPPAA is not absolute. There is an exception. *Central States, Southeast and Southwest Areas Pension Fund. v. Bomar Nat., Inc.*, 253 F.3d 1011, 1015-19 (7th Cir. 2001). Federal courts may excuse interim withdrawal payments pending arbitration "if the employer can show both that the pension fund lacks a colorable claim and that the employer will suffer severe financial hardship if compelled to make interim payments." *Id.* at 1016. To avoid interim liability, an "employer must establish 1) that the pension fund's claim is frivolous and 2) that imposing interim liability would cause irreparable harm." *Id.* at 1019. "Frivolous" for these purposes has historically been satisfied by a showing that a withdrawal liability assessment was "undisputably premature." *Id.* (citing *Cent. States. Se. & Sw. Areas Pension Fund v. Hunt Truck Lines, Inc.*, 204 F.3d 736 (7th Cir. 2000)). Not surprisingly, this "is a difficult standard to meet, and it is meant to be that way." *Id.* at 1019.

The Defendants have failed to develop any argument that the Pension Fund's declaration was frivolous. Nor can the Court discern one on the record: there is no reason to think that the Pension Fund's assessment of withdrawal liability was "undisputably premature." Dworkin and Newburgh ceased operations and thereby withdrew from the fund in February 2017, whereas the Pension Fund's first notice of withdrawal liability was dated July 14, 2017. Compl. at ¶¶ 17, 19; Defs.' Mot. Dismiss, Ex. 2 at 17. Even if the Defendants are still contesting in the arbitration (they have not done so here) who is part of the Dworkin Controlled Group, that would not tag the Pension Fund's position as frivolous. Nor is there a problem with notice,

12

because (as discussed earlier) the MPPAA permits pension funds to deal exclusively with the defaulting employers known to the funds (here, Dworkin and Newburgh), and any notice sent to one member of the group is considered constructive notice to all. *Chi. Truck Drivers,* 525 F.3d at 595-96.

Even had Dworkin and Newburgh satisfied the first element of the "pay now, dispute later" exception, they made no showing on the second: that imposing the withdrawal liability would cause them to suffer "irreparable harm." *Bomar*, 253 F.3d at 1019. An assertion of irreparable harm must be supported by evidence, such as affidavits or balance sheets. *Trs. of Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Rentar Indus., Inc.*, 951 F.2d 152, 155 (7th Cir. 1991). But the only evidence concerning financial stability here—Dworkin's and Newburgh's October 12, 2017 representations that they were insolvent and had ceased operations—would lead to the opposite conclusion, that is, no *additional* harm would accrue from an accelerated payment schedule for already-insolvent companies. Defs.' Mot. Dismiss, Ex. 2 (Oct. Letter) at 42. The Defendants have not made—indeed, did not try to make—a showing that the exception to the "pay now, dispute later" mechanism applies.

## IV. Conclusion

For the reasons explained above, the Defendants' motion to dismiss or in the alternative to stay is denied. What's more, because the Defendants were instructed to address why judgment should not be entered if they lost the motion, and they offered nothing, judgment is entered in favor of the Pension Fund and against the

13

Defendants in the amount of $7,722,361.20 in withdrawal liability. Post-judgment interest shall apply. The status hearing of September 11, 2020 is vacated.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 8, 2020